# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| TIMOTHY J. CLANCY; NICOLE L. CLANCY; and CLANCY'S ON ISLAND LAKE INC *d/b/a* Vacationaire Resorts *d/b/a* Clancy's Restaurant and Bar on Island Lake,<br><br>                    Plaintiffs,<br><br>     v.<br><br>VACATIONAIRE ESTATES, INC.; THE DONALD L. AND SANDRA S. FLAMM COMMUNITY PROPERTY TRUST; DONALD L. FLAMM; ERIC PHILLIP FLAMM; DENA ANN FLAMM; DANIEL RUSS ELSEY; CRAIG BINGEN; TODD JOEL JUNGWIRTH; and RICHARD JOSEPH JUNGWIRTH,<br><br>                    Defendants. | Civil No. 18-2249 (JRT/LIB)<br><br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |

Bradley A. Kirscher, **KIRSCHER LAW FIRM, PA,** 2489 Rice Street, Suite 121, Roseville, MN 55113, for plaintiffs.

Catherine Sung-Yun K. Smith and Eric S. Taubel, **GUSTAFSON GLUEK PLLC,** 120 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for defendants.

This case arises out of actions taken in an attempt to resolve a property dispute between neighbors. While the property dispute was resolved by a state court action, this federal action stems from Defendants' conduct before and during the pendency of the state court action. Plaintiffs allege that Defendants engaged in an ongoing pattern of terroristic actions, including threats and acts of violence, for the purpose of forcing Plaintiffs to give

up their interest in the disputed property. Plaintiffs bring a federal civil claim under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, as well as state law claims for tortious interference with prospective economic advantage, trespass, nuisance, and defamation.

Defendants have now moved to dismiss the case. Because the Plaintiffs have not satisfied the pleading standards, the Court will grant Defendants' Motion in full. It is conceivable that some of Plaintiffs' claims could survive a Motion to Dismiss if properly pled; thus, the Court will dismiss those claims without prejudice to afford Plaintiffs the opportunity to seek leave to amend.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.    The Parties

Plaintiffs Timothy J. Clancy and Nicole L. Clancy are Minnesota residents who operate a restaurant, supper club, resort, and motel in Park Rapids, Minnesota. (Compl. ¶¶ 9, 11, July 31, 2018, Docket No. 1.) Clancy's on Island Lake Inc. is a Minnesota corporation that does business in Park Rapids under the names Vacationaire Resorts and Clancy's Restaurant and Bar on Island Lake. (*Id.* ¶ 10.)

Defendant Vacationaire Estates, Inc. ("VE") is a Minnesota association that owns the land under and the common areas around ten cabins on Island Lake (the "VE Property"), adjacent to Plaintiffs' restaurant and motel (the "Clancy Property"). (*Id.* ¶¶ 12-

13.)  Plaintiffs claim that VE has been operated as a legitimate business but has also been used by the individual Defendants and the Flamm Trust as a criminal enterprise.  (*Id.* ¶ 85.)

Defendant Donald L. and Sandra S. Flamm Community Property Trust (the "Flamm Trust") is a family trust that owns real property across the street from Plaintiffs' restaurant (the "Flamm Property").  (*Id.* ¶ 14.)

Defendant Todd Joel Jungwirth previously owned the Flamm Property.  (*Id.*)  His son, Defendant Richard Joseph Jungwirth, visited or resided on the property.  (*Id.* ¶ 20.)

Plaintiffs allege that Defendant Donald L. Flamm resides in Edina, Minnesota, owns a cabin on VE property, is a member of VE, and is a trustee of the Flamm Trust.  (*Id.* ¶ 15.) However, Defendants have informed Plaintiffs and the Court that he predeceased the filing of the Complaint.  (Defs.' Mem. Supp. at 11, Sept. 20, 2018, Docket No. 17.)

Defendants Eric Phillip Flamm and Dena Ann Flamm are Minnesota residents who own a cabin on VE property and are members of VE.  (Compl. ¶ 16.)

Defendant Daniel Russ Elsey is a Minnesota resident, owns a cabin on VE property, is a member of VE, and has been the president of VE since August 2016.  (*Id.* ¶ 17.)

Defendant Craig Bingen is a Minnesota resident who owned a cabin on VE property and was a member of VE until he sold his cabin in June 2017.  (*Id.* ¶ 18.)

### B.    The Disputed Property

Four pieces of property are relevant to this dispute:  (1) the Clancy Property, (2) the VE Property, (3) the Flamm Property, and (4) Icon Drive, a road previously known as "old County Road 89."

The Clancy Property, the VE Property, and the Flamm Property were once under common ownership. (Aff. of Eric S. Taubel ("Taubel Aff.") ¶ 4, Ex. B. ("Am. State Court Findings") at 19, Sept. 20, 2018, Docket No. 18.) In 1963, the parcel of land that contained these three properties was deeded to David and Lora Lee Sedgwick, who subsequently founded a corporation called Vacationaire Inc. ("VInc.") and transferred the land to it. (*Id.*)

The original parcel contained a resort and what was referred to as the "owner's house," which is now the Flamm Property. (*Id.*) In 1971, Sedgwick decided to separate the cabins from the resort. (*Id.*) He formed VE, and VInc. deeded a parcel north of the resort with several cabins to VE. (*Id.*)

A county-owned road, County Road 89, ran through the original property. (*Id.* at 19-20.) In 1974, the county vacated that section of County Road 89, making it a private road now called Icon Drive. (*Id.* at 20.) The county relocated the road to another piece of land owned by VInc. (*Id.*) VInc. executed an easement to provide reasonable and adequate access over Icon Drive for ingress and egress to the VE property. (*Id.*)

A lodge was built on part of VInc.'s property in 1972, but there was no paved parking lot. (*Id.* at 19.) A parking lot was paved a few years after the lodge was built. (*Id.* at 20. Part of the lot lay on VE property, and VE paid to pave it. (*Id.* at 20.) Part of the parking lot lay on the "owner's house"/Flamm Property. (*Id.* at 21.)

In 1975, VInc. deeded the Flamm Property to one of its long-time employees, James Grewe, using the centerline of Icon Drive as the western boundary of the parcel. (*Id.* at 21.) Grewe would occasionally allow employees and guests of VInc.'s lodge to park vehicles in his portion of the parking lot. (*Id.*) Grewe worked for both VInc. and VE at

various times until 2000, including as VInc.'s president. (*Id.* at 19, 20-21.) While Grewe lived on the Flamm Property, all the landowners got along and there were no disputes about parking. (*Id.* at 21.) Icon Drive was open, and vehicles rarely parked on the road north of the parking lot. (*Id.*)

In 2000, Grewe closed the resort. (*Id.*) That same year, VInc., with Grewe as president, conveyed a parcel of land north of the Flamm Property to VE and gave VE an easement for ingress and egress over the land now owned by the Clancys. (*Id.*)

In 2002, VInc. sold the resort to Island Lake, Inc., a corporation owned by James Preiner. (*Id.*) In 2016, Island Lake, Inc. sold the resort to the Clancys on a contract for deed. (*Id.* at 22.)

Greta and Todd Jungwirth bought the Flamm Property in 2011 and resided there until 2017, when they sold it to the Flamm Trust. (*Id.*) Greta Jungwirth worked in the Clancys' restaurant for some time. (*Id.*) At some point, a dispute arose, and the Clancys told the Jungwirths that they were not allowed to access the Flamm Property using Icon Drive. (*Id.*) The Jungwirths found an alternate means of ingress and egress to avoid conflict and possible litigation. (*Id.*)

Members of VE initially frequented the Clancys' restaurant. (*Id.*) At some point, VE approached the Clancys regarding a proposed lease agreement for parking, but an agreement was never reached. (*Id.*) A dispute arose regarding parking, which led to the state litigation, (*id.*), and the conduct giving rise to this case.

### 1. Ownership of Icon Drive

As to ownership of Icon Drive, the state court ruled as follows:

> As to that part of Icon drive contained on vacated [County Road] 89, and within land abutted by VE and the Flamm Trust, the centerline shall be the property division between the abutting landowners . . . subject to easements on behalf of the properties lying to the north, including [VE]. . . . . Except for the part of the road owned by the Flamm Trust, the real property lying under Icon Drive, at issue in this proceeding, is currently owned by [VE]. . . . As the Clancys do not own or have any easement or right to use the road north of their property, neither they nor their patrons may park on or along the road north of their property line without permission. Vehicles parked without permission on or along the road on property owned by VE or the Flamm Trust may be towed at the owner's expense.

(*Id.* at 23.) Notably, this finding was a change from the state court's initial conclusion that the Clancys owned the portion of Icon Drive not owned by the Flamm Trust. (Taubel Aff. ¶ 3 & Ex. A ("Initial State Ct. Findings") at 8, 11.)

### 2. Ownership of the Parking Lot

As to ownership of the parking lot, the state court ruled as follows:

> VE is the owner of the paved section of the parking lot within its property boundary . . . .. As the Clancy's failed to establish their claims for adverse possession or a prescriptive easement[,] they and their patrons have no right to use this section of the parking lot without permission from VE. Vehicles parked without permission from VE on this section of the parking lot may be towed at the owner's expense. . . . The Flamm Trust is the owner of that part of the parking lot within its property boundary. As the Clancy's failed to establish their claims for adverse possession or any kind of easement[,] they and their patrons have no right to use this section of the parking lot without permission from the Flamm Trust. Vehicles parked

> without permission from the Flamm Trust on this section of the
> parking lot may be towed at the owner's expense.

(Am. State Ct. Findings at 23.) This finding was consistent with the court's initial

conclusion. (Initial State Ct. Findings at 8, 12.)

### C.    Conduct Supporting Plaintiffs' Claims

Plaintiffs allege that Defendants have engaged in "a nearly two-year pattern of

terroristic actions, terroristic threats, acts of violence, and threats of violence . . . with the

purpose of forcing the Plaintiffs out of business and forcing the Plaintiffs to surrender

ownership of real property to the Defendants." (Compl. ¶ 1.) At the time the Complaint

was filed, the state court had issued initial findings stating that Plaintiffs owned a portion

of Icon Drive but had no easement for parking on VE or Flamm property. (Initial State Ct.

Findings at 8, 11.) The state court later amended these findings to state that Plaintiffs did

not own Icon Drive. (Am. State Ct. Findings at 23.)

Plaintiffs allege the following facts:

In August 2016, Defendants Bingen, Elsey, and Eric Flamm "began a pattern of

terroristic acts, terroristic threats, acts of violence, threats of violence, and extortion

intended to force the Plaintiffs to surrender their property interest in [Icon Drive]."

(Compl. ¶ 42.) Defendants' conduct was intended to benefit VE and its cabin owners and

members, who "had actual knowledge of the conduct" of these defendants and "tacitly

approved" of it. (*Id.* ¶¶ 44-46.) Defendants sought to make Icon Drive exclusive to VE

and its cabin owners and members and to convert VE into a private gated community. (*Id.*

¶ 43.)

In August 2016, Elsey, Eric Flamm, and Todd Jungwirth placed cement blocks and a "no trespassing" sign in the center of Icon Drive.  (*Id.* ¶ 47 & Ex. E.)  They also painted parking spaces and placed "no parking" signs on the Flamm Property parking lot.[1]  (*Id.* ¶ 49.)  They made "terroristic threats" to shoot the Plaintiffs and their customers if they parked there.  (*Id.*)

By September 2016, Todd Jungwirth escalated the threats to include death threats against anyone entering the Flamm Property, and his behavior had "severely affected the Plaintiffs' business" by October 2016.  (*Id.* ¶¶ 50-51.)  On December 3, 2016, he "made terroristic threats of sexual violence" against Plaintiff Nicole Clancy, calling her a "cunt" and demanding that she "get over here and suck my cock."  (*Id.* ¶ 53.)  He pled guilty to disorderly conduct.  (*Id.*)  Plaintiffs allege that threats and harassment by the Jungwirth Defendants were continuous from August 2016 to February 2017 and that their intent was to force Plaintiffs to surrender "their property interest" in Icon Drive and the Flamm Property lot.  (*Id.* ¶¶ 54-55.)

The Flamm Trust purchased the Flamm Property from the Jungwirths in March 2017 for the purpose of "continu[ing] the pattern of terroristic threats and harassment in an attempt to force the Plaintiffs to surrender their interest" in the parking lots.  (*Id.* ¶¶ 57-58.)  The property has been vacant since the Jungwirths sold it to the Flamm Trust.  (*Id*. ¶ 58.)

---

[1] Plaintiffs refer to their interest in this parking lot as an "easement" on the Flamm Property, (Compl. ¶ 49), but the state court had already determined that Plaintiffs had no easement or right to use the parking lot on the Flamm Property or on VE's property.  (Initial State Ct. Findings at 8, 12; *see also* Am. State Ct. Findings at 23.)

Defendants Bingen, Elsey, and the Flamms continued a "pattern of terroristic acts, terroristic threats, and threats of violence from March 3, 2017, to the present in an attempt to force the plaintiffs to surrender their property interest" in the Flamm Property parking lot and in Icon Drive.  (*Id.* ¶ 59.)

On March 3, 2017, Defendant Bingen, who is known to carry a handgun, yelled "I'm going to kill that bastard" and "I just want to kill him" near Plaintiffs' restaurant while making noises mimicking gunshots.  (*Id.* ¶ 60.)  These threats were directed to Plaintiff Timothy Clancy and the Preiners.  (*Id.*)  Bingen pled guilty to disorderly conduct.  (*Id.*)

In April 2017, Defendant Eric Flamm began placing "no parking signs" on the Flamm Property while wielding a piece of wood as a club, which he brandished at Plaintiffs and their customers "in a threatening manner."  (*Id.* ¶ 63 & Ex. A.)  From April to September 2017, Eric and Donald Flamm used this club to threaten and intimidate Plaintiffs, their customers, and their employees.  (*Id.* ¶ 64 & Ex. B.)

From March 2017 to the present, each individual Defendant "committed multiple acts of violence or threats of violence against the person or property of the Plaintiffs, their employees, and their customers, including placing logs behind customers' cars and threatening to puncture their tires with nails or other objects."  (*Id.* ¶ 65 & Ex. C.)

During the summer of 2017, Defendants discharged firearms several times after 10 p.m. on VE's property adjacent to Plaintiffs' restaurant.  (*Id*. ¶ 66.)  This "late-night discharge of firearms" was intended to threaten Plaintiffs and harm their business.  (*Id.*)  It frightened Plaintiffs, their employees, and their customers.  (*Id.*)

In September 2017, the Flamms towed Plaintiffs' customers' vehicles parked on Icon Drive and in the Flamm Property parking lot. (*Id.* ¶ 67.) On September 8, Plaintiffs heard gunshots coming from the VE Property. (*Id.* ¶ 70.) Plaintiff Timothy Clancy drove down the road and saw "a person in a dark, hooded sweatshirt," who he believed to be Defendant Eric Flamm, "wielding a handgun." (*Id.*) The gunshots were intended to threaten Plaintiffs and harm their business. (*Id.*) The incident frightened them, their employees, and their customers. (*Id.*)

On the night of October 17, 2017, Defendant Elsey placed an unlit boat trailer across Icon Drive, intending for Plaintiffs, their employees, or their customers to hit it while driving. (*Id.* ¶ 71, Ex. D.) Defendants Elsey, Todd Jungwirth, and Eric Flamm placed other objects, including cement blocks, on Icon Drive. (*Id.* ¶ 72 & Ex. E.) This conduct, along with late-night discharge of firearms, continued through July 2018. (*Id.* ¶ 79.)

Defendants falsely reported criminal conduct by Plaintiffs to the sheriff and made false accusations against the sheriff when he refused to bring charges. (*Id.* ¶ 73 & Ex. F.)

Eric and Dena Flamm publicized several false and malicious reviews of Plaintiffs' restaurant. (*Id.* ¶¶ 74-77.) These reviews were publicized with the intent to harm Plaintiffs' business and force them to surrender "their property interest" in the Flamm Property parking lot and Icon Drive. (*Id.* ¶ 78.)

### D. Injury/Damages

Plaintiffs allege that they experienced "a drop in sales beginning in August 2016 and continuing through the present time" that they expect will continue. (*Id.* ¶ 81.) They

estimate their lost profits from August 2016 to June 2018 as $243,000 to $307,000.00.  (*Id.* ¶ 82.)  They also allege that their business has suffered loss of goodwill.  (*Id.*)

Plaintiffs allege that, because Defendants' conduct was intentional and malicious, they should be subject to punitive damages.  (*Id.* ¶ 83.)  Plaintiffs seek "past and future damages, statutory damages, treble damages, exemplary damages, punitive damages, interest, costs, disbursements, and attorneys' fees" on their claims.  (*Id.* at 15.)

## II.      PROCEDURAL BACKGROUND

The state court issued initial findings regarding the property dispute on May 29, 2018.  (Taubel Aff. ¶ 3 & Ex. A.)  Plaintiffs filed their federal complaint on July 31, 2018.  (Compl.)  Defendants filed their Motion to Dismiss on September 20, 2018.  (Mot. to Dismiss, Sept. 20, 2018, Docket No. 15.)  The state court issued amended findings regarding the property dispute on September 13, 2018.  (Am. State Ct. Findings at 24.)

## DISCUSSION

## I.   STANDARD OF REVIEW

Plaintiffs must plead "a short and plain statement of the claim showing that [they are] entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* While a complaint need not contain detailed factual allegations, it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* If the facts pled are "merely consistent with" a defendant's liability, they "stop[] short of the line between possibility and plausibility," and the complaint must be dismissed. *Twombly*, 550 U.S. at 557. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Moreover, a complaint must provide more than "labels and conclusions" and "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).

At the motion-to-dismiss stage, the Court may consider state-court decisions without converting the motion into one for summary judgment because state-court decisions are part of the public record. *Appliance Recycling Centers of Am., Inc. v. Protiviti, Inc.*, No. CV 18-702 (JRT/HB), 2018 WL 3475489, at *3 (D. Minn. July 19, 2018).

## II.        RULE 8(a)(2) ANALYSIS

The Court will grant Defendants' Motion and dismiss Plaintiffs' Complaint in its entirety for failure to follow Rule 8(a)(2).  The Complaint fails to lay out the elements of

any claim, fails to indicate which factual allegations support which claims, and fails to identify which claims are asserted against which defendants.

The Supreme Court has said that Rule 8(a)(2)'s plain statement requirement is designed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiffs fail to give Defendants fair notice because they fail to identify which claims are asserted against each defendant. Plaintiffs also fail to give Defendants fair notice of the grounds upon which the claims rest because they fail to connect any of the factual allegations to the causes of action pled.

Fair notice is required because Rule 8(b) requires a defendant to respond to a complaint with a short and plain statement of defenses "to each claim asserted against it" and to admit or deny a plaintiff's allegations. Defendants cannot properly respond where "a plaintiff files a 'kitchen sink' or 'shotgun' complaint asserting every conceivable claim against every conceivable defendant." *City of Wyoming v. Procter & Gamble Co*., 210 F. Supp. 3d 1137, 1153 (D. Minn. 2016) (quoting *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831–32, 839–40 (D. Minn. 2012)). In *Tatone*, Judge Davis found that "[a] complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant." *Id.* at 831. As in *Tatone*, the Defendants in this case – and the Court – are "left to guess which Plaintiffs are asserting which claims against which Defendants." *Tatone*, 857 F. Supp. 2d at 831-32 (quoting *Tully*

*v. Bank of Am., N.A.*, No. CIV. 10-4734 (DWF/JSM), 2011 WL 1882665, at *6 (D. Minn. May 17, 2011)).

Ultimately, pleadings must be construed "so as to do justice." Fed. R. Civ. P. 8(e). Allowing this action to proceed on the present complaint would do injustice to Defendants, who have not been put on notice of what claims and allegations they must defend against. Because Plaintiffs have failed to satisfy Rule 8(a)(2), the Court will grant Defendants' Motion to Dismiss and dismiss the action in its entirety. Nevertheless, because Plaintiffs may be able to cure some pleading deficiencies with an amended complaint, the dismissal will be without prejudice except as indicated by this Order.

## III.     IMPROPER JOINDER

### A.     Defendant Donald L. Flamm

Defendants argue that Donald L. Flamm was improperly named as a defendant under Minn. Stat. § 573.01 because he predeceased the Complaint. A Court may order substitution of the proper party upon a motion by any party when a party dies before a claim is extinguished. Fed. R. Civ. P. 25(a)(1). However, no such motion is before the Court. The Court will thus dismiss all claims against Donald L. Flamm with prejudice.

### B.     Defendant Flamm Trust

Defendants also argue that the Flamm Trust was improperly named as a defendant. A trust is traditionally "not considered a distinct legal entity, but a 'fiduciary relationship' between multiple people" that cannot be made party to an action. *Americold Realty Tr. v. Conagra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016). The Supreme Court of Minnesota has

said that a trust is made up of three components:  a trustee, a beneficiary, and the interest which is divided between them; as such, "[a] trust . . . is not itself a 'thing' or a person under the law." *Sec. Bank & Tr. Co. v. Larkin, Hoffman, Daly & Lindgren, Ltd.*, 916 N.W.2d 491, 501 (Minn. 2018), *reh'g denied* (Aug. 21, 2018).[2]  As such, the Court will dismiss all claims against the Flamm Trust with prejudice.

## IV.      RICO CLAIM

While the Court doubts that the facts will ultimately support a RICO claim, it is conceivable that Plaintiffs could assert a RICO claim against some of the Defendants.  A civil RICO claim has four elements:  defendants engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *H & Q Properties, Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009)).

While a corporation or other entity can be liable under RICO, the alleged RICO enterprise generally does not face liability.  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1110 (D.C. Cir. 2009) (citing 18 U.S.C. § 1961(3)).  Rather, it is the vehicle through which the racketeering activity is carried out.  *Id.*  As such, the Court will dismiss the RICO claim against VE with prejudice.

---

[2] Moreover, the Complaint is devoid of any conduct undertaken by the Flamm Trust, and it would be impossible for a trust, which is not a thing or person under the law, to commit an intentional tort.

### A.    Conduct

The "conduct" element of RICO claims "authorize[s] recovery only against individuals who 'participate in the operation or management of the enterprise itself.'" *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  "An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.  An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery."  *Id.* at 1348 (quoting *Reves*, 507 U.S. at 184).

Plaintiffs fail to plead facts showing participation in the operation or management of the enterprise as to all Defendants except Elsey, who was alleged to be the president of VE.  Should the Plaintiffs seek to amend their Complaint, this deficiency must be addressed.

### B.    Enterprise

"Enterprise" refers generally to "the vehicle through which the unlawful pattern of racketeering activity is committed."  *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 259 (1994).  RICO broadly defines "enterprise" to "includ[e] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  To allege an enterprise in the Eighth Circuit, Plaintiffs must show:  "(1) a common or shared purpose; (2) some

continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Handeen*, 112 F.3d at 1351.

While there are some facts that might support a finding of a common purpose and an ascertainable structure distinct from that inherent in a pattern of racketeering, Plaintiffs have alleged no facts regarding continuity of structure and personnel. Should Plaintiffs seek leave to amend their Complaint, this deficiency must be addressed.

## C.    Pattern

"A pattern is shown through two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'" *Nitro Distrib., Inc.*, 565 F.3d at 428 (quoting *Wisdom v. First Midwest Bank*, 167 F.3d 402, 406 (8th Cir. 1999)). Plaintiffs must establish either that "multiple predicate acts occur[ed] over a substantial period of time (closed-end continuity)" or that "the alleged predicate acts threaten to extend into the future (open-ended continuity)." *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1028 (8th Cir. 2008). The Eighth Circuit has held that closed-end continuity "can be shown by related acts continuing over a period of time lasting at least one year." *Crest Const. II, Inc.*, 660 F.3d at 357 (quoting *United States v. Hively*, 437 F.3d 752, 761 (8th Cir. 2006)). In contrast, ten or eleven months is insufficient. *Primary Care Inv'rs, Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215 (8th Cir. 1993).

Plaintiffs allege a "nearly two-year pattern of terroristic actions, terroristic threats, acts of violence, and threats of violence by the Defendants." (Compl. ¶ 1.) If all the acts alleged are racketeering activity, Plaintiffs have sufficiently pled closed-end continuity.

### D. Racketeering Activity

Racketeering is defined as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A). Minnesota law prohibits coercion, which is making a threat, either orally or in writing, to unlawfully inflict bodily harm if the threat "causes another against the other's will to do any act or forbear doing a lawful act." Minn. Stat. § 609.27.

Racketeering also includes violations of the Hobbs Act, which prohibits extortion. *See* 18 U.S.C. § 1961(1)(B) (citing 18 U.S.C. § 1951). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." *Id.* § 1951(b).

The allegations as currently pled do not constitute coercion under Minnesota Law. Plaintiffs allege that Defendants engaged in "a pattern of terroristic acts, terroristic threats, acts of violence, threats of violence, and extortion intended to force the Plaintiffs to surrender their property interest in old County Road 89." (Compl. ¶ 42.) But Plaintiffs do not allege which lawful acts they forbore as a result of Defendants' threats, and they certainly did not give up their perceived property rights, which they argue was Defendants' goal.

Whether the allegations as currently pled constitute extortion under the Hobbs Act is a closer call. Plaintiffs do not allege that Defendants obtained any property from them. However, "[f]or purposes of the 'obtaining of property' requirement, the offense of

**attempted** extortion is complete when the defendant has attempted to induce his victim to part with property." *See United States v. Foster*, 443 F.3d 978, 985 (8th Cir. 2006) (emphasis added) (quoting *United States v. Frazier*, 560 F.2d 884, 887 (8th Cir. 1977)). Plaintiffs allege that Defendants' conduct was intended to induce Plaintiffs to give up their perceived property rights.

### E.    Injury

Defendants argue that Plaintiffs cannot connect any of their alleged injuries to the racketeering activities.  But Plaintiffs need not prove injury at the motion to dismiss stage; rather, the injury must be plausible.  *Iqbal*, 556 U.S. at 678.

Plaintiffs allege that they suffered "a drop in sales," estimated "lost profits from August 2016 through June 2018 of $243,000.00 to $307,000.00," and loss of goodwill. (Compl. ¶¶ 81-82.)[3]  Looking solely at the racketeering activity, which consisted of alleged extortion, it is plausible that Plaintiffs suffered a loss of sales and profits.  In a small rural community, it is plausible that word got out that patrons were being threatened at Plaintiffs' restaurant and, as a result, their number of customers declined.

Defendants also argue that Plaintiffs' allegations contradict their injury because Plaintiffs stated that their restaurant was "extremely busy" during summer 2017 and "very busy" during September 2017.  (Compl. ¶¶ 66, 70.)  However, even if Plaintiffs were busy

---

[3] Defendants argue that Plaintiffs have owned the restaurant for such a short amount of time that their claims of damages are not grounded in objective measurements.  Plaintiffs bought the property in April 2016 and allege that by August 2016 they had lost profits.  Indeed, the Court is skeptical that Plaintiffs could measure this loss after being in operation only a few months, especially given how much their sales likely vary with the seasons.

during these times, it is plausible that they would have been even busier were it not for Defendants' conduct.

While skeptical that Plaintiffs will ultimately be able to sustain a RICO claim, the Court would consider a motion for leave to amend the Complaint if Plaintiffs can show that amendment would address the deficiencies.

## V. STATE LAW CLAIMS

### A. Tortious Interference with Prospective Economic Advantage

A claim for tortious interference with prospective economic advantage under Minnesota law has five elements: "(1) the existence of a reasonable expectation of economic advantage belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the expectation absent the defendant's conduct; and (5) damages." *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1136 (D. Minn. 2016) (quoting *Daum v. Planit Sols., Inc.*, 619 F.Supp.2d 652, 658 (D. Minn. 2009)). Furthermore, a plaintiff "must identify a specific third party with whom the defendant tortiously interfered." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.* 844 N.W. 2d 210, 221 (Minn. 2014). "The mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law." *Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1405 (8th Cir. 1993).

Because Plaintiffs fail to identify a specific third party with whom Defendants tortiously interfered, their claim must fail. *See, e.g. H Enters. Int'l, Inc. v. Gen. Elec. Capital Corp.*, 833 F. Supp. 1405, 1417 (D. Minn. 1993) (noting on consideration of a motion to dismiss that allegations of "[t]he mere loss of unspecified business" are insufficient); *Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. The Star Tribune Co.*, No. CIV 05-735 (PAM/RLE), 2005 WL 1661514, at *5 (D. Minn. July 15, 2005) (granting motion to dismiss where plaintiffs only "generally aver[red] an interference with unspecified consumers"), *aff'd sub nom. Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. Star Tribune Co.*, 201 F. App'x 382 (8th Cir. 2006). Should Plaintiffs seek leave to amend their Complaint, this deficiency must be addressed.

**B.     Nuisance**

Under Minnesota law, nuisance is defined as "[a]nything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Minn. Stat. § 561.01. To survive a motion to dismiss, Plaintiffs must plead that their property was injuriously affected or that their enjoyment of the property was lessened by the nuisance. *Ebert v. Gen. Mills, Inc.*, 48 F. Supp. 3d 1222, 1234 (D. Minn. 2014). Furthermore, the interference with Plaintiffs' property must be "material and substantial." *Id.* (citing *Citizens for a Safe Grant v. Lone Oak Sportsmen's Club, Inc.*, 624 N.W.2d 796, 803 (Minn. Ct. App. 2001)). A court measures the degree of interference "by the standards of ordinary people in relation to the area where they reside." *Citizens for a Safe Grant*, 624 N.W. 2d at 803.

As to Defendants' alleged threats and vulgar language, Plaintiffs do not allege what injury they caused to Plaintiffs' property or their use and enjoyment thereof. Indeed, Plaintiffs do not even allege that the threats were made on or near Plaintiffs' property. As to Defendants' alleged late-night gunfire, there is no allegation that Plaintiffs' property was injured, that Plaintiffs used their property differently as a result of Defendants' conduct, or that any interference with Plaintiffs' use and enjoyment was material and substantial. Nor are there any allegations regarding community standards. Should Plaintiffs seek leave to amend their Complaint, these deficiencies must be addressed.

### C.     Trespass

"Trespass encompasses any unlawful interference with one's person, property, or rights, and requires only two essential elements: a rightful possession in the plaintiff and unlawful entry upon such possession by the defendant." *Special Force Ministries v. WCCO Television*, 584 N.W.2d 789, 792–93 (Minn. App. 1998) (citations omitted), *review denied* (Minn. Dec. 15, 1998). Plaintiffs concede that their trespass claim must be dismissed because it has been determined that they did not possess the disputed property. As such, the Court will dismiss this claim with prejudice.

### D.     Defamation

Defamation has three elements: "(1) a false statement; (2) communicated to someone other than plaintiff; (3) which tends to harm plaintiff's reputation or lower his esteem in the community." *Walker v. Wanner Eng'g, Inc.*, 867 F. Supp. 2d 1050, 1054 (D. Minn. 2012) (citing *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.

1980).  To support a claim for defamation, a statement must "be 'of and concerning' the plaintiff, either explicitly or 'by fair implication.'"  *East Coast Test Prep LLC v. Allnurses.com, Inc.*, 307 F. Supp. 3d 952, 965 (D. Minn. 2018) (quoting *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001)).  Furthermore, "[o]pinion is absolutely protected by the First Amendment."  *Id.* (quoting *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986)).  In determining whether a statement is fact or opinion, the Court must consider "the statement's precision and specificity, plausible verifiability, and the literary and public contexts in which the statement was made."  *Id.*

As a preliminary matter, Plaintiffs do not specify which parts of the alleged defamatory statements are false or constitute defamation.  While portions of a few of the statements may be verifiable, most of the statements at issue are merely opinion.

In Exhibit F, Plaintiffs submit two YouTube comments as "examples of the Defendants' accusations against the sheriff."   (Compl. ¶ 73 & Ex. F.)  Neither comment mentions Plaintiffs by name.  Without more context, the comments cannot constitute defamation because they are not "of and concerning" Plaintiffs, even by fair implication.

In Exhibit G, Plaintiffs submit two identical Google reviews, allegedly published by Defendants, stating that Plaintiffs' restaurant served "[l]ow quality food, cold fries, soggy fish and undercooked hamburgers." (Compl. ¶ 74 & Ex. G.)  Low quality food, cold fries, and soggy fish are subjective descriptions that constitute opinions, not defamation. Indeed, the public context of these descriptions places them even more squarely in the opinion category, because Google reviews are a platform for expressing opinions on the quality of various establishments.  The statement that Plaintiffs served "undercooked

hamburgers," (*id.*), is a closer call because it could be opinion (i.e. some people might say a medium rare hamburger is "undercooked") or fact (i.e. at some temperatures a hamburger would be unsafe to eat). Nevertheless, the statement is imprecise, and the public context pushes it towards the opinion category. As such, these reviews likely cannot constitute defamation.

In Exhibit H, Plaintiffs submit a review allegedly posted by Defendants on Yelp, saying that Plaintiffs' restaurant "fall[s] short on food quality, service and friendliness," that "[f]ood took an hour and a half and we were served cold, undercooked fries, and soggy breaded fish that tasted like it had been microwaved," and that "[i]t appears there is a lot of turmoil with this business as you will frequently see Hubbard county sheriff cars in the parking lot." (Compl. ¶ 75, Ex. H.) The first two phrases are certainly subjective, unverifiable statements that constitute opinion. However, the statement regarding sheriff cars in the parking lot may be verifiable and would tend to harm Plaintiffs' reputation.

In Exhibit I, Plaintiffs submit a review allegedly posted by Defendants on Yelp saying: "Terrible service, broasted chicken was not good and the staff was unpleasant. Wouldn't recommend." (Compl. ¶ 76, Ex. I.) This statement is nothing more than opinion and cannot support a claim of defamation.

Finally, in Exhibit J, Plaintiffs submit a statement allegedly by Defendants saying:

> We neighbor this restaurant and things have gotten so bad that we had to get a restraining orders [sic] against 2 of the owners. They are constantly harassing us, having their patrons threaten us (cause of course their patrons only hear one side of the story)…terrible place.

(Compl. ¶ 7 & Ex. J.)  There is no allegation regarding where the statement was published, thus it is difficult to consider the public context of this statement.  But most of the statement seems verifiable and goes beyond mere opinion regarding the quality of the food or service.

## VI.  PUNITIVE DAMAGES

Plaintiffs' Complaint alleges that Defendants' conduct "was intentional and malicious, for which they should be subject to punitive damages."  (Compl. ¶ 83.)  Because punitive damages are not generally available under RICO[4], which allows for treble damages, the Court assumes that Plaintiffs seek punitive damages only on the state law claims.  But Minnesota law does not allow plaintiffs to seek punitive damages upon filing a complaint.  Minn. Stat. § 549.191.  Rather, "a party may make a motion to amend the pleadings to claim punitive damages."  *Id.*; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA, v. Donaldson Co., Inc.*, No. 10-CV-4948 (JRT/TNL), 2016 WL 6902408, at *4 (D. Minn. June 15, 2016); *Holmberg v. Morrisette*, 800 F.2d 205, 211 (8th Cir. 1986).  Should Plaintiffs seek leave to amend their Complaint, they must not include punitive damages.

## VII.  LEAVE TO AMEND

The Court will give leave to amend the Complaint if "justice so requires," Fed. R. Civ. P. 15(a); however, it will not do so if amendment would be futile, *Doll*, 793 F.3d at

---

[4] *See, e.g., Humana Inc. v. Forsyth*, 525 U.S. 299, 303 (1999) (comparing RICO, which "authorizes treble damages," to state law, which "permits recovery of compensatory and punitive damages"); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 507 (2008) (describing RICO's treble damages as analogous to pegging punitive damages to compensatory damages using a three-to-one ratio).

857.  Should Plaintiffs seek to amend their Complaint, they must make a motion for leave to amend and must attach a proposed amended complaint to the motion so that  the Court can consider whether the proposed amendments would cure the deficiencies.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion to Dismiss [Docket No. 15] is **GRANTED**;

2. All claims against Defendant Donald L. Flamm are **dismissed with prejudice**;

3. All claims against Defendant Flamm Trust are **dismissed with prejudice**;

4. Plaintiffs' RICO claim against Vacationaire Estates, Inc., is **dismissed with prejudice**;

5. Plaintiffs' trespass claim is **dismissed with prejudice**; and

6. The remaining claims are **dismissed without prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  February 27, 2019
at Minneapolis, Minnesota.

_____ s/John R. Tunheim ___
JOHN R. TUNHEIM
Chief Judge
United States District Court